## FEORE v. NORTH SHORE BUS CO., Inc.
### Civ. No. 6524.

District Court, E. D. New York.
Oct. 15, 1946.

Knowlton Durham, of New York City, for plaintiff.

Jacob I. Goodstein, of New York City, for defendant.

KENNEDY, District Judge.

In this action the plaintiff seeks damages in the amount of $501.60 under section 8, subd. (e), of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 308, subd. (e).

Prior to August 21, 1942 plaintiff was employed by the defendant as a bus operator. On that day he enlisted for training and service in the United States Coast Guard. He was honorably discharged on July 14, 1945. He allowed 89 of the 90 days mentioned in the statute to go by before he applied on October 11, 1945 to the defendant for reinstatement. On October 12, 1945 plaintiff worked 2½ hours on what is called a "trip" (an irregular and isolated run), and then decided to take a vacation for two weeks. On October 24, 1945 plaintiff returned to the defendant's property, and there ensued a discussion between him and defendant's superintendent, who suggested that plaintiff wait until the "next regular selection of runs" (this would take place in January 1946) and offered plaintiff meanwhile the No. 1 position on the "extra list". This needs explanation.

Under its contract with the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Division No. 1056, defendant is bound to post schedules of runs for picks four times in each year (January, April, June and September) unless otherwise agreed between the companies and the union. Plaintiff, by the way, is and was a member of the union, is fully cognizant of the provisions of the contract, and actively participated in union meetings. The contract provision which I have paraphrased was undoubtedly evolved primarily to serve the convenience of the union and its members. Defendant has some 220 bus drivers in its employ and it is easy to see that the simplest way to respect seniority rights, and at the same time give maximum convenience to the driver-employees, is to distribute "runs" reasonably often, but not too often. Perhaps I can clarify this.

Some "runs" are more desirable than others. Naturally a driver who operates his bus from 6:00 o'clock in the morning until 2:00 in the afternoon, without any "swings", or waiting time, and whose work is on weekdays only, has a desirable run. On the other hand, night operation, Sunday work, and runs which, though consuming a total of only the regulation number of hours, are broken up by intervals of waiting are undesirable. The union has a seniority list (plaintiff's number was 21) and it is only understandable that under its rules the men with greatest seniority have the first selection of runs.

But seniority changes when death, resignation, or other severance from the service occurs. Seniority status also changes when, as here, veterans return from the service. And in the last instance mentioned, which is the case at bar, if runs must be readjusted every time a veteran returns, particularly where the returned employee enjoys high seniority, a succession of changes may be made necessary. The result will be that the man with greater

seniority will or may deprive the driver with less seniority of the run which the latter was operating. This process is called "bumping". And the record makes it clear that the union of which plaintiff is and was a member was not in favor of indiscriminate "bumping" each time the seniority status changed.[1] To meet the difficulty, as I have said, the contract between the union and the company provides for a maximum number of four redistributions of runs in any year, unless the union and the company agree to more.

This should make clear the dilemma in which the defendant was placed when on October 24, 1945 plaintiff returned and demanded exactly the same run as that which he had operated in 1942, so far as seniority of selection is concerned. To deny him this seniority might be to run foul of the statute. 50 U.S.C.A.Appendix, § 308, subd. (e). To grant it would be to run foul of the union contract.

Under these circumstances defendant on October 24, 1945, in perfect good faith and without any intention to violate the statute, suggested to the plaintiff that he would be given a position at the top of the "extra list" until the next scheduled pick of runs (which actually occurred in January 1946), at which time plaintiff could select his work in strict accordance with his seniority position. This would avoid any possible difficulty with the union or violation of the contract. But plaintiff verbally refused to take anything less than a run to which he would be entitled strictly according to seniority, a position which he later confirmed to the company by telegram dated October 27, 1945.

As it turned out, if plaintiff had accepted the defendant's suggestion he would have suffered no money loss [2] and hardly any inconvenience, because, as it turned out, continuously from October 24, 1945 to January 5, 1946 the top man on the extra list was in a situation to select runs quite similar to that which plaintiff had operated before he entered the service.[3]

On November 1, 1945 defendant notified plaintiff that unless he returned he would be discharged, and on November 7, 1945 he was given notice of his "discharge", whereupon he complained to the Selective Service Headquarters. A period of negotiation followed. On January 2, 1946, at the time of the regularly scheduled pick of runs, plaintiff returned, was permitted to select a run in accordance with his seniority, and resumed work on January 7, 1946. This was just prior to the commencement of the lawsuit.

At the time of the trial I had some doubt whether, on familiar principles, there was jurisdiction to award relief in the way of damages when the returned veteran, prior to the commencement of the action, has in fact been reinstated. This doubt was removed by the opinion of Judge Swinford in Hall v. Union Light, Heat & Power Co., D.C.E.D. Kentucky, Covington Division, 1944, 53 F.Supp. 817. I turn now to the questions which I think are here for decision.

Did the defendant in this case on October 24, 1945 tender to the plaintiff a position of "seniority, status and pay" similar to that occupied by him when he entered the service?

The defendant argues that if the plaintiff had accepted the suggestion made by it

---

[1] Plaintiff by the way denied from the witness box that his union was against the process of "bumping". This is untrue.

[2] Three men junior to plaintiff on the extra list earned between October 24, 1945 and January 6, 1946 respectively the sums of $668.70, $548.42 and $590.68. The amount demanded in the complaint by plaintiff is $501.60.

[3] The runs which were available to the top man on the extra list were as follows: from October 12 to October 18, 1945, run 704; from October 19 to November 25, 1945, run 803; from November 27 to December 1, 1945, run 763; from December 3d to December 30, 1945, run 704; on December 31, 1945, run 655; on January 2, 1946, run 651; from January 3d to January 5, 1946, run 803. At the time of plaintiff's enlistment he was operating run 505. Roughly he worked from 5:30 a. m. to 2:30 p. m. on each weekday and had his Sundays off. All of the runs which I have enumerated were operated on weekdays only, involved hardly any waiting time, and within an hour or so corresponded roughly to the period 5:30 a. m. to 2:30 p. m.

on October 24, 1945, he would have suffered no money loss and would have worked substantially the same hours as he did just prior to August 21, 1942, the day of his enlistment. I have found as a fact that this was so in the findings which accompany this memorandum. Indeed it can scarcely be the subject of dispute. Plaintiff argues he could not have foreseen this, and even if he could have, there is still a substantial difference under the statute between the tender of a position on the extra list, and restoration to the regular seniority list.

If I were not dealing with a statute like this one (50 U.S.C.A.Appendix, 301 et seq.), I would unhesitatingly decide the issue in defendant's favor. But the Supreme Court says that each provision of the statute must be given "as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits" and that "these provisions guarantee the veteran against loss of position or loss of seniority by reason of his absence". Fishgold v. Sullivan Dry Dock & Repair Corporation, 1946, 328 U.S. 275, 66 S.Ct. 1105. It is perfectly obvious that in circumstances like those in the cause at bar the statute operates in a very inequitable manner. As the defendant observes, it puts this plaintiff in a position where he, as a returned veteran, must be satisfied regardless of how adversely his action affects everyone else, even co-members of his own union, and possibly other returned veterans junior to him. But if hardship in operation is to be a reason for depriving the veteran of seniority in its widest and fullest sense, then it is only a question of time before the statute becomes a dead letter. And so I reach the conclusion that however trifling the difference between what plaintiff formerly had in the way of seniority and what defendant tendered him for a short period, the plaintiff is under the law justified in the position he took on October 24, 1945.

Was the defendant, on October 24, 1945, within the exception of the statute (50 U.S.C.A.Appendix, § 308, subd. (b) (B) making it inapplicable where "the employer's circumstances have so changed as to make it impossible or unreasonable" to restore the returned veteran to his former position, or one of like seniority, status and pay?

At first blush, it would seem that the defendant, under contract with the union not to rearrange its schedule of runs more often than four times a year, absent any agreement to the contrary, was certainly in an impossible position when a union member demanded that it do that very thing in his case. The best proof that such demand by a union member would be unreasonable, at least in the language of the man in the street, is to be found in the fact (and it is a fact) that prior to plaintiff's return all discharged veterans took their places on the extra list until a scheduled pick of runs was regularly held. Since the outbreak of war approximately 120 drivers have returned, and only the plaintiff has insisted upon disturbing the schedules.

Plaintiff suggests that the contract provision came into force (February 1, 1945) after he enlisted (August 21, 1942) and therefore has no significance. As I read the facts the article providing for the selection of runs in January, April, June and September contained in the current contract (Article 19, pl. ex. 5) merely reiterates similar provisions which have been in force since 1941, and if there were nothing more in the case on this head I would be tempted to think that plaintiff was being merely super-technical. However, there is more: the Supreme Court has plainly said that "no practice of employers or agreements between the employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act". Fishgold v. Sullivan Dry Dock & Repair Corporation, supra. And so I find myself compelled both by the statute and the gloss to reach the conclusion that it is not an "unreasonable" situation under the statute where an employer is under a union contract, and is compelled by a returning veteran to breach it.

Under this same head the defendant points to the fact that in all exactness the run formerly operated by plaintiff no longer exists. Its argument then runs that it could at best supply plaintiff with work approximating that which he had done before, and in fact it did this when it offered

him the top position on the extra list. As I have indicated above, this argument would be persuasive were it not for my duty to interpret the magic word "seniority" liberally in favor of the returned veteran.

If I am right in all that I have said, this plaintiff is entitled to a judgment of some sort.

■ Plaintiff made no effort whatever to secure employment of any kind during the period between October 24, 1945 and January 7, 1946. Beyond question he could have secured equivalent employment. In fact, what I have said about defendant's offer of extra work is almost conclusive on the point that his potential earnings would have exceeded his demand for damages.

Was plaintiff under any duty to mitigate damage?

The temptation is very strong to say that a returned veteran can, if he chooses, stand upon the letter of the law, but that like any other litigant he ought not be permitted to enhance the damage by remaining idle when work is available. True enough it would be unjust to expect him to take hazardous employment, or some position otherwise highly undesirable to a man of his standing in the community. But there is nothing like that here. Plaintiff was offered identically the same type of employment that he had been satisfied to carry on for years before his enlistment, in the same company, at the same compensation, and during substantially the same hours.

Despite all this I think that a holding, even in a case such as this one, that a returned veteran is under an obligation to mitigate damage would be most unfortunate. The rights and liabilities growing out of a statute like this one simply cannot be fitted into the framework of principles accepted in controversies with which the Courts must ordinarily deal. Congress and the public were fully alive to the necessity of protecting veterans against any sacrifices at home that could be spared them. One of these was loss of employment, or even loss of seniority, at least during a reasonable period of readjustment. To hold that employers can compel such sacrifices, and then put the returned veteran to his proof of the amount by which his money loss could have been diminished, is to encourage the very thing that the Act was designed to prevent. And this is true just as much in the case of the litigious veteran, like this plaintiff, as it is in the case of the returned veteran who is alive to the rights of others as well as his own.

If one allows himself to be influenced, as in this cause, by the fact that the plaintiff waited 89 days before he applied for reinstatement, that during these 89 days there occurred a regular selection of runs, then on the 90th day he asked and secured a further vacation to go hunting, that upon his return he refused a position substantially similar to his old one, that at the trial he engaged in a perfectly futile attempt to show in the teeth of the strongest kind of evidence to the contrary that his union was not against continuous disruption of schedules—if one is to take matters of that sort into consideration, and withhold relief on the principle that the plaintiff's conduct exhibits a pattern of unfairness, and that he should have kept down the damage, then selfish employers will inevitably use such a holding as a weapon against returned veterans who are deserving of every consideration.

I conclude reluctantly that plaintiff is entitled to a judgment in the full amount.

I hope there will be a review of my decision, for which reason I request the submission by both counsel of supplemental findings. I say "supplemental", because I have filed my own findings of fact and conclusions of law. But lest I omit something, counsel are at liberty to suggest findings and conclusions also. I will not of course find any facts which are completely at variance either with what I have said here, or with my own findings.